**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-2442**

---

FOUR L COAL COMPANY; OLD REPUBLIC INSURANCE
COMPANY,

Petitioners,

versus

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR;
JACK LESTER (deceased),

Respondents.

---

On Petition for Review of an Order of the Benefits Review Board.
(02-693-BLA)

---

Argued: September 20, 2005      Decided: October 20, 2005

---

Before WILKINSON and WILLIAMS, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

---

Petition denied by unpublished per curiam opinion.

---

**ARGUED:** Mark Elliott Solomons, GREENBERG TRAURIG, L.L.P.,
Washington, D.C., for Petitioners. Sarah Marie Hurley, UNITED
STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington,
D.C., for Respondents. **ON BRIEF:** Laura Metcoff Klaus, GREENBERG
TRAURIG, L.L.P., Washington, D.C., for Petitioners. Howard M.
Radzely, Solicitor of Labor, Donald S. Shire, Associate Solicitor,
Christian P. Barber, Counsel for Appellate Litigation, UNITED
STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington,
D.C., for Respondents.

--------------------

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Four L Coal Company and its insurer, Old Republic Insurance Company, petition for review of the final decision and order of the Benefits Review Board (the Board) directing them to pay medical benefits on behalf of Jack Lester to the Black Lung Disability Trust Fund (the Trust Fund).[1]  For reasons that follow, the petition is denied.


I

Lester worked approximately twenty-eight years in the coal mines, spending approximately twenty-seven of them underground.  He ended his mining career with Four L in 1976 at the age of fifty.[2]

Lester filed a claim for black lung benefits on March 10, 1980.  After almost sixteen years of litigation, an award of black lung benefits in his favor became final on March 26, 1996, when Four L elected not to appeal the Board's final award determination.[3]

Following the Board's March 26, 1996 decision, the Department of Labor (the DOL) asked Four L to reimburse the Trust Fund the sum

---

[1]We will refer to Four L Coal Company and Old Republic Insurance Company collectively as Four L.

[2]Lester is now deceased.

[3]The final award determination was based on, <u>inter alia</u>, x-ray and medical opinion evidence evincing the existence of pneumoconiosis.

of $14,103.09 for Lester's medical treatment expenses paid by the Trust Fund. The DOL later reduced this request to $7,407.97. Four L declined to reimburse the Trust Fund, so the dispute went before an ALJ, who issued a decision and order directing Four L to reimburse the Trust Fund in the amount of $7,407.97.

On appeal, the Board affirmed the ALJ's finding that Lester was entitled to the presumption that the conditions for which he sought treatment were caused or aggravated by his pneumoconiosis, see Doris Coal Co. v. DOWCP, 938 F.2d 492 (4th Cir. 1991), but vacated the award of benefits and remanded the case. Specifically, the Board directed the ALJ to reconsider the medical reports of Dr. Gregory Fino and Dr. Michael Sherman, the only two doctors who reviewed the medical opinion evidence in terms of the compensability of the contested medical treatment expenses. In light of its remand, the Board further instructed the ALJ to determine whether the medical reports of Drs. Robert Baxter, Bradley Berry, and Vinod Modi were credible in light of their fraud convictions.

On remand, the ALJ reexamined the record, observed that Four L failed to rebut the Doris Coal presumption, and concluded that the DOL met its evidentiary burden through the medical opinion evidence provided by Dr. Sherman. Accordingly, Four L once again was directed to reimburse the Trust Fund. Four L appealed to the Board, and on May 30, 2003, the Board affirmed the ALJ's decision.

- 4 -

Four L moved for reconsideration, which the Board summarily denied. Four L then timely petitioned this court for review.

## II

### A

Our review of the Board's order is limited. We review the Board's decision to assess whether substantial evidence supports the factual findings of the ALJ and whether the legal conclusions of the Board and the ALJ are rational and consistent with applicable law. Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Bill Branch Coal Corp. v. Sparks, 213 F.3d 186, 190 (4th Cir. 2000) (citation and internal quotation marks omitted).

A miner is entitled to medical benefits to pay the cost of medical treatment incurred as a result of his pneumoconiosis. 20 C.F.R. § 725.701(a). The medical benefits encompass "such medical, surgical, and other attendance and treatment, nursing and hospital services, medicine and apparatus, and any other medical service or supply, for such periods as the nature of the miner's pneumoconiosis and disability requires." Id. § 725.701(b).

Through Doris Coal and its progeny, this court has clarified the process by which a miner whose lung disease has been adjudged to be totally disabling may sustain a claim for medical benefits.

- 5 -

In order to demonstrate his eligibility, the miner must show that the mine operator was responsible for his pneumoconiosis and that the particular medical expenses for which he seeks reimbursement were necessary to treat his disabling condition. Doris Coal, 938 F.2d at 495. An expense is deemed necessary to treat pneumoconiosis if the treatment "relates to any pulmonary condition resulting from or substantially aggravated by the miner's pneumoconiosis." Id. at 496. In establishing this framework, we presume that "most pulmonary disorders are going to be related or at least aggravated by the presence of pneumoconiosis." Id. As a result, "when a miner receives treatment for a pulmonary disorder, a presumption arises that the disorder was caused or at least aggravated by the miner's pneumoconiosis." Id. at 496-97.

Thus, the Doris Coal presumption permits a miner to satisfy his initial burden of production regarding his eligibility for medical benefits by presenting his underlying award of black lung benefits, which specifies the conditions and symptoms that were found to be disabling and the expenses he claims are related to those conditions and symptoms. Id. at 496. The mine operator may then rebut the presumption of relatedness by showing that a particular expense is actually: (1) "for a pulmonary disorder apart from those previously associated with the miner's disability"; (2) "beyond that necessary to effectively treat a covered disorder"; or (3) "not for a pulmonary disorder at all." Gulf & Western Indus.

- 6 -

v. Ling, 176 F.3d 226, 231, 233 (4th Cir. 1999). Throughout the process, however, the burden of persuasion as to relatedness remains with the miner. Lewis Coal Co. v. DOWCP, 373 F.3d 570, 575 (4th Cir. 2004).

B

In this case, the record contains evidence that three of Lester's treating physicians, Drs. Baxter, Berry, and Modi, were convicted of "fraudulent billing practices." (J.A. 15a). Each of these physicians opined, during their treatment of Lester, that Lester suffered from, among other things, coal workers' pneumoconiosis.

The record also reflects that Dr. Dale Sargent saw Lester five times between October 1994 and June 1996. Dr. Sargent found that Lester suffered from mild to moderate obstructive lung disease due to previous cigarette smoking and possibly due to asthma. Dr. Sargent also observed that Lester's respiratory symptoms may have been related to left ventricular function and congestive heart failure, not to any "obtained airways disease." (J.A. 308). Dr. Sargent did note, however, that Lester had "some airways disease." (J.A. 308). He further observed that Lester's pulmonary function tests showed moderate obstruction.

Dr. Sherman reviewed Lester's medical records, the contested medical treatment bills, and Four L's reasons for denying

responsibility for the payment of those bills. Based on Lester's coal mine employment history of twenty-eight years, his respiratory symptoms, his pulmonary function test results showing moderate obstructive lung disease, his chest x-ray consistent with pneumoconiosis, and his blood gas study results revealing a widened arterial-alveolar oxygen gradient, Dr. Sherman diagnosed "obstructive chronic bronchitis (a form of chronic obstructive lung disease or COPD), which is a known pulmonary complication of exposure to coal dust, and therefore meets the legal criteria for coal workers' pneumoconiosis (CWP)." (J.A. 107).[4] Dr. Sherman also acknowledged that Lester suffered from other medical problems including diabetes mellitus and coronary artery disease. He reasoned that medications, office visits, and diagnostic tests prescribed for COPD were reimbursable, "as were antibiotics when they were clearly given for COPD flares." (J.A. 107). According to Dr. Sherman, the Trust Fund was entitled to receive the $7,407.97 it requested from Four L.

Dr. Gregory Fino also reviewed Lester's medical records and the disputed medical bills. He assumed that Lester had pneumoconiosis, which he defined as including all diseases caused or aggravated by the inhalation of coal dust. In his view,

---

[4]COPD is an acronym for chronic obstructive pulmonary disease, which includes asthma, chronic bronchitis, certain types of emphysema, and other conditions. Glen Coal Company v. Seals, 147 F.3d 502, 509 n.6 (6th Cir. 1998).

however, none of Lester's pulmonary function studies revealed an obstruction. Dr. Fino acknowledged Dr. Sargent's 1994 diagnosis of mild to moderate obstructive lung disease "due to previous cigarette smoking and possible asthma," but Dr. Fino observed that "clinical obstructive lung disease requiring treatment with bronchodilators was clearly not present in the 1980s when this man's lung function was normal." (J.A. 80). According to Dr. Fino, Lester developed chronic obstructive pulmonary disease with bronchospasm long after he left coal mine employment. Consequently, Dr. Fino found that Lester's pulmonary disease could not be attributable to coal dust inhalation. Rather, he opined that Lester must have developed asthma.

C

In his decision, the ALJ concluded that Four L failed to rebut the Doris Coal presumption and that the DOL carried its burden of proof. In finding that Four L failed to rebut the Doris Coal presumption, the ALJ found Dr. Fino's opinion to be inadequate. The ALJ discredited Dr. Fino's opinion because he failed to indicate how Lester's disabling pneumoconiosis manifested itself. Moreover, the ALJ discredited Dr. Fino's opinion because his conclusion, that the pulmonary conditions complained of by Lester in 1994 could not have been the result of coal dust exposure because Lester left coal mine employment in 1976, was inconsistent

- 9 -

with 20 C.F.R. § 718.201(c), which notes that pneumoconiosis is recognized as a latent and progressive disease which may first become detectable only after cessation of coal dust exposure. In rendering his decision, the ALJ found that the criminal convictions of Drs. Baxter, Berry, and Modi did not necessarily render fraudulent the treatment they provided. The ALJ reasoned that, in 1994, Dr. Sargent had diagnosed Lester as suffering from a pulmonary impairment of undetermined etiology and that his opinion lent credence to the diagnoses and treatment provided by the three other physicians.

In our view, the ALJ correctly concluded that Four L failed to meet its evidentiary burden under the Doris Coal presumption. The ALJ understandably was troubled by the fact that, although Dr. Fino acknowledged that Lester was totally disabled by pneumoconiosis (the premise of Lester's medical benefits award), Dr. Fino identified no physical manifestations of this disability. Moreover, the ALJ rightfully was troubled by Dr. Fino's opinion because his opinion was based in part on the flawed premise that a miner with no apparent pulmonary impairment upon leaving the coal mines could never thereafter develop a coal dust related impairment. We have consistently recognized that little weight should be given to medical findings that conflict with the implementing regulations of the Black Lung Benefits Act (BLBA), which recognize that clinically disabling pneumoconiosis is a

"'progressive disease.'" Lewis Coal Co., 373 F.3d at 580 (quoting 20 C.F.R. § 718.201(c)); see also Roberts & Schaefer Co. v. DOWCP, 400 F.3d 992, 999 (7th Cir. 2005) (affirming the ALJ's decision to discount the doctor's opinion because it conflicted with "§ 718.201(c)'s recognition that pneumoconiosis can be latent and progressive").[5]

D

Four L also argues that the Doris Coal presumption is no longer good law in light of the Supreme Court's decisions in Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002), and DOWCP v. Greenwich Collieries, 512 U.S. 267 (1994). We disagree.

Initially, it should be noted that we have applied the Doris Coal presumption after the Supreme Court decided Nord, Ragsdale, and Greenwich Collieries. See Lewis Coal Co., 373 F.3d at 576-80. In any event, an analysis of these cases makes their inapplicability pellucid.

In Nord, the Court declined to extend to ERISA benefits claims the treating physician rule applicable in Social Security cases, under which deference is due to the opinion of a claimant's regular

---

[5]We also note that, in finding in favor of the DOL, the ALJ correctly placed the ultimate burden of persuasion on the DOL. In holding that the DOL met its burden of proof, the ALJ decided to credit Dr. Sherman's opinion over that of Dr. Fino's, and we certainly cannot say that the ALJ erred in this regard.

treating physician. 538 U.S. at 831-34. Initially, the Court noted that no agency deference was required because the Secretary of Labor opposed the application of the treating physician rule to ERISA benefits claims. Id. at 831-32. The Court next observed that whether a treating physician rule would increase the accuracy of ERISA determinations was a question for the "Legislature or superintending administrative agency" because "[i]ntelligent resolution of the question . . . might be aided by empirical investigation of the kind courts are ill equipped to conduct." Id. at 832. Finally, the Court relied on the "critical differences" between the Social Security disability program and ERISA benefits plans. Id. The Court noted that the former involves an obligatory, nationwide program and the latter involves a company's voluntary establishment of an ERISA benefits plan. Id. at 833. Understandably, the Court stressed the need to give plan administrators the most flexibility possible because a claim for ERISA benefits will likely turn on the interpretation of the terms of the ERISA benefits plan. Id. In contrast, an ALJ applies uniform federal criteria in adjudicating a social security disability claim, so the need for flexibility was not evident. Id. Moreover, in contrast to ERISA, the treating physician rule grew out of the need to administer a large benefits program efficiently and fostered "uniformity and regularity in Social Security benefits

determinations made in the first instance by a corps of administrative law judges." Id.

Nord is of no help to Four L. Unlike the ERISA benefits plans at issue in Nord, we see no need to give ALJs in the black lung medical benefits context greater flexibility to adjudicate claims. This certainly would not foster "uniformity and regularity" in the administration of these claims in which a uniform set of federal criteria is applied. Furthermore, unlike Nord, the administrative agency, here the DOL, supports the Doris Coal presumption. Finally, we do not agree with Four L's position that we are "ill-equipped" to engage in the kind of "empirical investigation necessary to validate" the Doris Coal presumption. Petitioner's Br. at 28. As we noted in Ling, the threshold creating entitlement to black lung medical "benefits--that the pulmonary condition treated be merely aggravated by the miner's pneumoconiosis--is low enough to permit a rational conclusion that a particular respiratory infirmity will likely be covered." 176 F.3d at 233.

In Ragsdale, after taking thirty weeks of leave to recover from cancer, the employee requested additional leave. 535 U.S. at 84-85. Her employer denied the request for an extension and fired her after she failed to return to work. Id. at 85. Because her employer had never notified her that twelve weeks of absence would count as her Family Medical Leave Act (FMLA) leave, the employee subsequently sued under the FMLA, alleging that as the result of

her employer's failure to comply with certain DOL regulations she was entitled to twelve weeks of FMLA leave in addition to the thirty weeks she had already taken. Id. The specific provision the employee relied on was 29 C.F.R. § 825.700(a), which provided that, "[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." The Supreme Court invalidated 29 C.F.R. § 825.700(a), holding that the regulation "effects an impermissible alteration of the statutory framework." Ragsdale, 535 U.S. at 96. In so ruling, the Court noted that 29 C.F.R. § 825.700(a) automatically required an employer to give an employee an additional twelve weeks of leave in the event the employer failed to comply with the notice regulations, whether or not the employee was able to prove "any real impairment of their rights and resulting prejudice[,]" thus, fundamentally altering the FMLA cause of action. Ragsdale, 535 U.S. at 90. The Court further reasoned that mandating additional leave in the event of a notice violation even if the employee suffered no harm "amends the FMLA's most fundamental substantive guarantee--the employee's entitlement to 'a total of 12 workweeks of leave in any 12-month period.'" Id. at 93 (quoting 29 U.S.C. § 2612(a)(1)). The Court thus affirmed summary judgment in favor of the employer, finding that the employee's FMLA rights were not prejudiced by the lack of notice, Ragsdale, 535 U.S. at 90, and

that the FMLA guaranteed the employee only twelve weeks of leave, not twelve weeks in addition to the thirty she had already taken. Ragsdale, 535 U.S. at 96.

In our case, the Doris Coal presumption has none of the deficiencies the Court found in the Ragsdale regulation. Most importantly, the Doris Coal presumption is rebuttable. Once the employer marshals credible rebuttal evidence that the treated pulmonary problem is not related to the miner's pneumoconiosis, the presumption evaporates. Further, the Doris Coal presumption does not alter the remedial scheme in a manner contrary to the BLBA. Consistent with the BLBA, the burden of persuasion remains at all times with the miner. Lewis Coal Co., 373 F.3d at 575.

Turning to the Supreme Court's decision in Greenwich Collieries, we have specifically rejected the argument that the Doris Coal presumption is no longer good law in light of the Court's decision in Greenwich Collieries, where the Court held that the DOL's true doubt rule, which required an ALJ to find in favor of the claimant when the evidence was evenly balanced, violated § 7 of the Administrative Procedures Act. See Ling, 176 F.3d at 234 ("In as much as the presumption does not shift the burden of proof in medical benefit cases from the claimant to the party opposing the claim, it is not contrary to the Supreme Court's decision in Greenwich Collieries."). Obviously, as a panel of this court, we have no authority to overrule a prior panel's decision; only an en

banc court has such authority.  <u>Jones v. Angelone</u>, 94 F.3d 900, 905 (4th Cir. 1996).

III

For the reasons stated herein, the petition for review is denied.

<u>PETITION DENIED</u>